1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE SOUTHERN DISTRICT OF TEXAS

3    VICTORIA DIVISION

| | | |
|---|---|---|
| 4  UNITED STATES OF AMERICA | § | CASE NO. 6:16-CR-077-1 |
| | § | CORPUS CHRISTI, TEXAS |
| 5  VERSUS | § | WEDNESDAY, |
| | § | OCTOBER 12, 2016 |
| 6  RAMON DE LA CRUZ, JR. | § | 2:02 P.M. TO 3:40 P.M. |

7

MISCELLANEOUS / DETENTION HEARING

8

9    BEFORE THE HONORABLE B. JASON B. LIBBY
     UNITED STATES MAGISTRATE JUDGE

10

11

APPEARANCES:

12

APPEARANCES:                          SEE NEXT PAGE

13

ELECTRONIC RECORDING OFFICER:         JUDITH F. ALVAREZ

14

CASE MANAGER:                         KENDRA BLEDSOE

15

16

17

18

19

20    TRANSCRIPTION SERVICE BY:

21    JUDICIAL TRANSCRIBERS OF TEXAS, LLC
          935 ELDRIDGE ROAD, #144
22        SUGAR LAND, TEXAS 77478
      Tel:  281-277-5325 / Fax:  281-277-0946
23        www.judicialtranscribers.com

24

      Proceedings recorded by electronic sound recording;
25       transcript produced by transcription service.

1                          <u>APPEARANCES</u>:

2
FOR THE PLAINTIFF,              HUGO MARTINEZ, ESQ.
3   UNITED STATES OF               US ATTORNEY'S OFFICE
AMERICA:                       800 N. SHORELINE BLVD.
4                                  SUITE 500
CORPUS CHRISTI, TX  78401
5

6
FOR THE DEFENDANT,             GOCHA ALLEN RAMIREZ, ESQ.
7   RAMON DELACRUZ, JR.            G. ALLEN RAMIREZ
ATTORNEY AT LAW
8                                  515 E. SECOND STREET
RIO GRANDE, TX 78582
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX

| WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| STEVE GREENWELL | | | | |
| By Mr. Martinez | 27 | . | . | . |
| By Mr. Guerrero | . | 38 | . | . |
| IMA GARCIA | | | | |
| By Mr. Guerrero | 53 | . | . | . |
| REBECCA SAENZ | | | | |
| By Mr. Guerrero | 56 | . | . | . |
| By Mr. Martinez | . | 60 | . | . |

| EXHIBITS: | Marked | Offered | Received |
|---|---|---|---|
| Defendant's Exhibit 1 | 66 | 66 | 66 |

CORPUS CHRISTI, TEXAS; WEDNESDAY, OCTOBER 12, 2016; 2:02 PM.

1

2          THE COURT:  Good afternoon.  Please be seated.

3  Let's call the case.

4          THE CLERK:  Yes, sir.

5          The Court calls CRV-16-77, United States versus

6  Ramon DeLaCruz.

7          May I have appearances, please?

8          MR. MARTINEZ:  Hugo Martinez, United States.  Good

9  afternoon, Your Honor.

10          THE COURT:  Afternoon.

11          MR. RAMIREZ:  Your Honor, G. Allen Ramirez and

12  Fabian Guerrero, for the Defendant, Ramon DeLaCruz.  He's

13  present and ready.

14          THE COURT:  Okay.

15          MR. GUERRERO:  Good afternoon, Judge.

16          THE COURT:  Good afternoon.

17          Mr. DeLaCruz, give me a moment to get my paperwork

18  together. It will take just a moment.

19          We were last in Court as you recall because your

20  lawyer filed a Motion to Reopen the Detention Hearing.  You

21  had previously waived the Detention Hearing without

22  prejudice.  That means that your lawyer was free to file a

23  Motion to Reopen the Detention Hearing, and he did that, and

24  you were set for a Detention Hearing last week.

25          However, I think the day before your detention

1 | hearing or thereabouts, the Government, that is, the federal
2 | prosecutor who is in charge of your case, filed a Motion to
3 | Continue the Detention Hearing until a possible conflict of
4 | interest has been determined.  We were in Court, I think,
5 | last Friday and all of this was brought to the attention of
6 | the Court and I continued today, and I ordered the lawyers
7 | to confer to see if they could come to some agreement about
8 | whether or not there is a conflict of interest and then
9 | report to me today with an update on your conference about
10 | the conflict of the interest.

11 | So, let me start with you, Mr. Martinez.  What's
12 | the Government's position on the conflict of interest or
13 | what needs to be done today?

14 | MR. MARTINEZ:  Yes, Your Honor, just to bring to
15 | the Court's attention, the case has been presented to a
16 | Grand Jury, and it hasn't been returned as a True Bill.

17 | It is the Government's position that if there is
18 | still a conflict of interest in this particular case,
19 | Ms. Patti Booth's case, she is present in the courthouse,
20 | but she is in another courtroom.  After discussing the issue
21 | with her, it is her opinion that there is a conflict of
22 | interest that needs to be heard before the District Judge.

23 | THE COURT:  Before the District Judge, okay.

24 | And then, what's the defense position this conflict
25 | of interest, Mr. Ramirez?

1          MR. RAMIREZ:  Judge, I haven't been given, even

2   though I have spoken to Ms. Booth, twice, I have not been

3   given specifics with reference to my conflict.  I was given

4   one specific with reference to a police officer who was

5   indicted a couple of years ago and sentenced out of -- from

6   the Rio PD.  He worked with HIDTA actually. Ms. Booth

7   indicated that I had represented him in a divorce, which was

8   not accurate.  I had represented him on a paternity suit

9   where, after the DNA test came back, it was negative, and so

10  he went his way, and I went my way.  Obviously, there is no

11  conflict of interest there, in that particular instance.

12          With reference to any other conflict, I have not

13  been given specifics so it's impossible for me to represent

14  to the Court whether or not I'm conflicted.  I don't know.

15          THE COURT:  I understand.  Kendra, was this motion

16  that was filed the Motion to Continue the Detention Hearing,

17  was that filed under seal?

18          THE CLERK:  Yes, sir.

19          THE COURT:  It was.  Hugo, has the defense been

20  provided with this Motion to Continue the Detention Hearing?

21          MR. MARTINEZ:  I don't know, Your Honor.

22          MR. RAMIREZ:  I have, Your Honor.

23          THE COURT:  Okay, all right, so I'm always

24  concerned about letting the cat out of the bag, if there are

25  matters that have been filed under seal, but I think for

purposes of the Record and for Mr. DeLaCruz, this is the

information that has been provided to the Court.

The Government has alleged in their Motion to

Continue the Detention Hearing that was filed last week.

That attorney, Mr. Ramirez, has previously represented one

of the cooperating co-conspirators in a state civil case.  I

take that probably is the divorce case, the paternity case?

MR. RAMIREZ:  Yes, sir.

THE COURT:  And then further, it says Mr. Ramirez

has represented another cooperating co-conspirator, CC #2 in

a related case, and then it doesn't provide any further

details about what the related case is.  It could be related

to the paternity but I really doubt it, so it's probably

related, at least according to the Government, the

underlying alleged criminal activity that's involved

allegedly in this case.

And then the Government further goes on to say that

in this case the Government intends to present evidence that

cooperating co-conspirator #1, that's the person who was

involved in the paternity dispute, that that person was

directly involved in the criminal acts of the Defendant here

before me, Ramon DeLaCruz, and others in a large-scale

marijuana trafficking conspiracy.

And so, the Government is, at least, proposing that

it intends to call this person as a witness in the criminal

1    case.

2            Second, it says the Government intends to present

3    the direct testimony of cooperating co-conspirator #2

4    concerning the aggravated kidnapping and murder of an

5    individual.  And then it says:

6        "If this case were to go to trial, there would be

7        testimony from an additional cooperating co-conspirator

8        #3, who would testify that the Defendant Ramon DeLaCruz

9        disposed of the weapon that was used during this

10       criminal episode."

11           That's the substance of what the proposed or

12   possible conflict of interest is, but for purposes of an

13   arraignment and a detention hearing today, Mr. Martinez, is

14   the government going to call any of these cooperating co-

15   conspirators to testify at a detention hearing?

16           MR. MARTINEZ:  Not, this afternoon, Your Honor.

17   The Government's positon that the conflict of interest has

18   to be worked out before we move toward any detention hearing

19   for legal reasons.

20           I don't have any issue with moving forward on the

21   arraignment.  The issues as to whether or not these

22   gentlemen are conflicted out is something that Judge Rainey

23   will have to decide and then I believe, assuming Judge

24   Rainey says that there is no conflict, then we would be

25   ready to move forward on the Detention Hearing, and if he

1  says, there is, then obviously we do plan to be at that.

2  THE COURT: Okay, well, I'm going to hear the

3  detention hearing today because I believe that Mr. DeLaCruz

4  should have this issue litigated and then I don't know what

5  I'm going to do on the Detention Hearing. If I deny it, and

6  Judge Rainey determines that there is a conflict of

7  interest, and new lawyers are appointed, I'll make sure that

8  it's clear that at least from my order that Mr. DeLaCruz

9  could move to reopen the Detention Hearing. If I were to

10 grant the Defendant's request for a bond, there would be no

11 prejudice to Mr. DeLaCruz. If there were later determined

12 to be a conflict of interest, I think Mr. DeLaCruz is right

13 to have his detention hearing heard, is an important

14 consideration for the Court, but I'm getting ahead of

15 myself, so let me just go through a few things and just talk

16 to Mr. DeLaCruz.

17 MR. RAMIREZ: Judge, may I address the Court?

18 THE COURT: You may.

19 MR. RAMIREZ: And out of an abundance of

20 precaution, the Government, and this may have just been, he

21 misspoke, but he mentioned whether these gentlemen are

22 disqualified. Mr. Guerrero, there has been no allegation

23 that he is in anyway disqualified. He is co-counsel with me

24 on this case, legally. He actually made the first

25 appearance with Mr. DeLaCruz, so out of an abundance of

1 precaution, what I can do is I can step back and allow

2 Mr. Guerrero to handle the Detention Hearing and the

3 Arraignment, and avoid any appearance of impropriety until

4 this qualification hearing is held, but there has been no

5 allegation that he has been disqualified.

6         MR. MARTINEZ:  May I address the Court, Your Honor?

7         THE COURT:  You may.

8         MR. MARTINEZ:  My statements were intentional, and

9 it is the Government's position that if one lawyer is

10 disqualified, he can't go out and hire another lawyer to get

11 around the conflict.

12         MR. GUERRERO:  No, Judge, I can address it.  Let me

13 address that, Your Honor.

14         THE COURT:  Yes, sir?  We'll go back and forth.  I

15 will give you each an opportunity to talk.

16         MR. MARTINEZ:  So, I don't think the taint of the

17 conflict is going to be resolved by simply hiring another

18 lawyer to come in and handle some of the procedures, so it's

19 the Government's position that if one is disqualified, they

20 are both disqualified, and that is something we are ready to

21 move forward on before the District Judge.  I understand the

22 Court's ruling in reference to moving forward with the

23 Detention Hearing, but I just wanted to address that issue

24 on the Record, so we are all on the same page on that.

25         THE COURT:  Okay, you've stated that.  First off,

1  well, I said I'd give you an opportunity, so go ahead.  Go

2  ahead, Mr. --

3  MR. GUERRERO:  Your Honor, it didn't happen the way

4  it was just outlined by the Government.  I was hired by the

5  family, Mr. Ramon DeLaCruz's wife, to assist in the case,

6  and I appeared with Mr. Ramon DeLaCruz and I handled legal

7  matters.

8  At a point, Ramon DeLaCruz decided to hire,

9  independent of any consultation with me, a very capable

10 counsel, Allen Ramirez, I would reference it.  Mr. Ramirez

11 needed to visit with Ramon DeLaCruz, and I suggested rather

12 than withdraw, I said, it's going to make it easier on

13 everybody, you just filed a notice of appearance as co-

14 counsel, and you can go ahead and have access to the client

15 and not anticipating in any manner that this would

16 transpire, what's just occurring right now.

17 But it did not happen as it being described.

18 THE COURT:  Okay, all right, understood.  And

19 you've had your opportunity to state that, and I think I

20 understand the facts and Mr. Martinez's position may be,

21 though, as I understand it that having co-counsel on the

22 case from the Government's perspective does not resolve this

23 potential conflict of interest that Mr. Ramirez may have in

24 the case.

25 MR. MARTINEZ:  That's correct, Your Honor.

1    THE COURT:  And so, from the Government's

2 perspective, what their position is, is they still are going

3 to need this issue litigated and having co-counsel on the

4 case does not resolve the case for, you know, all purposes,

5 and I understand that position.

6    With regard to the Arraignment and the Detention

7 Hearing, first off, as it stands today, who is the lead

8 counsel for Ramon DeLaCruz?

9    MR. RAMIREZ:  I am, Your Honor.

10    THE COURT:  Okay, you are the lead counsel.  And

11 Mr. Guerrero is the co-counsel.  And so what Mr. Ramirez has

12 suggested is that Mr. Guerrero take the reins and handle the

13 Arraignment and the Detention Hearing with Mr. Ramirez not

14 being, you know, I guess, directly involved in these

15 preliminary pretrial proceedings.

16    Do you understand that request, Mr. DeLaCruz?

17    DEFENDANT DE LA CRUZ:  Yes, Your Honor.

18    THE COURT:  And so, basically, Mr. Guerrero would

19 like to take over as lead counsel for today's purposes for

20 purposes of your Detention Hearing and your Arraignment.

21 Are you in agreement with that?

22    DEFENDANT DE LA CRUZ:  Yes, Your Honor.

23    THE COURT:  Okay, and then, I don't want to know

24 the substance of your communication with your lawyers, but

25 have you talked with your lawyers in private about what a

1   conflict of interest is?

2              DEFENDANT DE LA CRUZ:  Briefly, Your Honor.

3              THE COURT:  Okay, briefly.  Well, I'm going to talk

4   to you today in a little bit more detail about that.  I'm

5   not going to decide if there is a conflict of interest in

6   your case, but I think it is always appropriate for the

7   Court to advise you what your rights are with regard to

8   these proceedings and these procedures, and it's appropriate

9   for you to be appropriately informed so that you can make

10  intelligent decisions on your case and who you want your

11  lawyer to be.

12             First off, lawyers are governed to some extent by

13  ethical rules and in Texas, they are the Texas Disciplinary

14  Rules of Professional Conduct and there is a rule that

15  states that a lawyer shall not represent a person, which

16  would be you, if the representation of you involves a

17  substantially related matter in which your interests are

18  materially and directly adverse to the interests of another

19  client of the lawyer or the lawyer's firm.

20             Or, a lawyer shall not represent a person if the

21  representation of that person reasonably appears to become

22  adversely limited by the lawyers or the law firm's

23  responsibility to another client or to a third person, or by

24  the lawyers or law firm's own interests.

25             And so that is one of the rules relating to a

conflict of interest and the reason for that, there are many
reasons, but one of the reasons is the lawyer owes a duty of
loyalty to the person that he or she is representing.  So
that when you stand in Court with your lawyer, and that when
your lawyer stands with you, your lawyer can look out for
your interests without being concerned about the interests
of another client or former client so that you know when you
walk into Court and in your pretrial proceedings your lawyer
can use all of the tools at his disposal to zealously
represent you without having to hold back his punches for
concerns about hurting another client.

The Government thinks that your lawyer,
Mr. Ramirez, may have a loyalty to another client, which
could prevent his zealous representation of you.  I'm not
going to decide today whether or not there is, but I wanted
to make sure that you understand what this issue is about
and in that regard, there are some things that Courts have
directed or applied some guidance for the lower Court and
the District Courts to go over with you.

First off, as I informed you last week, under the
Constitution and the laws of the United States, and
specifically the Sixth Amendment, you have the right to the
effective assistance of counsel, and if you can afford a
lawyer, you can hire the lawyer of your choice, but if you
cannot afford a lawyer, you have the right to request a

1  Court-appointed lawyer, and if you qualify the Court would

2  appoint a lawyer to represent you at no cost to you, and I'm

3  not getting involved in deciding whether you should ask for

4  a Court-appointed lawyer or hire another lawyer but it's

5  important you understand what your rights are because

6  sometimes people come to Court and they have a lawyer and

7  they don't know that they at least have the option of asking

8  the Court to terminate that lawyer's representation and

9  appoint a lawyer, so I'm telling you specifically that if

10  you were not satisfied with your lawyers, you could fire

11  your lawyers and request Court-appointed counsel.

12          Do you understand?

13          DEFENDANT DE LA CRUZ:  Yes, Your Honor.

14          THE COURT:  Okay.  And I need to advise you of some

15  potential -- I need to give you some practical examples of

16  what these potential conflicts of interest might be.  When a

17  lawyer has two clients who might be involved in the same

18  activity, this dual representation or former representation

19  may inhibit or prevent a lawyer from conducting an

20  independent legal investigation in support of your case.

21          For example, if your lawyer were to have learned

22  something from a former client, that information could have

23  been learned through a confidential communication and the

24  lawyer has a duty to keep communications between a client

25  secret, and so then your lawyer could be in a position of

not being able to tell you something that he learned about

your case, or to use it in your case.  For example, this

apparently does not apply in your case, but the classic

example is a former client tells his lawyer where the murder

weapon is, and then that weapon if it were found could

somehow be used to the benefit of the other client, but if

the lawyer got that information from another client, he

could be prevented from telling you about it or presenting

that evidence.  That's just one example is the duty of

loyalty and confidentiality to a former client.

Also, I don't have any idea if the Government would

even consider doing this in the case, but the Government has

the ability to offer Defendants and witnesses and other

persons immunity, that is a formal immunity to prosecution,

and it's typically in exchange for testimony or other

cooperation, but a lawyer could be inhibited from zealously

pursuing immunity on behalf of one client if that grant of

immunity was conditioned on the Defendant cooperating

against the former client.

And so, a lawyer may feel inhibited about pursuing

immunity if it would hurt another client.  Same thing with

the cooperation.  This is the one that comes up all the

time.  The prosecution always offers Defendants an

opportunity to cooperate but that cooperation is usually not

limited and it usually has to be against all persons who are

1 involved in a case.

2          And so, if you were in a position of -- and I don't

3 know that you are, but if you were in a position of

4 cooperating against other persons for a reduced sentence, if

5 one of those other persons were a former client of your

6 lawyer, that could put your lawyer in a position of not

7 being able to help you pursue that.

8          And the concern would be that, we hear this all the

9 time in the Courts, is that "my lawyer didn't want me to

10 cooperate because it would hurt his other client."  And, I

11 don't know that that would be the case here, but that's the

12 concern is that if helping one client cooperate hurts the

13 interests of another client, there can be a conflict of

14 interest.

15          And sometimes in a case, the best defense is

16 everybody else is guilty, but I'm innocent, and that

17 requires the Defendant's lawyer to go after each of the

18 other persons in an alleged conspiracy in an effort to

19 exonerate himself, so sometimes the lawyer has to go in and

20 zealously go after each and every one of the other persons

21 who might be involved in the case, and if one of those other

22 persons is a former client, a lawyer might be less zealous,

23 or the concern is that the lawyer might be zealous in going

24 after the other people in an effort to protect you.

25          I think I told you about this other potential

conflict last week, is that when a person testifies, you
want your lawyer to take the gloves off, or at least have
the ability to take the gloves off and to go after that
person who is testifying, especially if his testimony is
damaging to you.  The Government has represented that they
have these cooperating co-conspirators who are going to
testify against you. The Government believes that
Mr. Ramirez represented them.

If Mr. Ramirez, not today, but at a later trial,
Mr. Ramirez is put in a positon of having to cross-examine
these cooperating Defendants, you don't want him to hold his
punches.  You want him to use everything at his disposal to
go after them, and if he's represented those persons
previously as their lawyer, that presents a problem for him,
it may present a problem for him in being able to zealously
represent them to kind of draw to this to a, or to make a
point here, and I'm not asking you to answer this.  This is
a rhetorical question.

But how would you feel if in six months from now
you were a witness in a case and Mr. Ramirez or Mr. Guerrero
had a new client and they were called upon to cross-examine
you.  If you are sitting in that witness stand and your
former lawyer is now cross-examining you, that presents a
real problem because what about all those things that you
told your lawyer in confidence in getting ready for your old

case, and what about your lawyer looking out for your interests, and how can this person who was your lawyer a few months ago, now be trying to discredit you and to hurt you on the stand, and sometimes it happens that a person testifies so poorly that they end up being prosecuted for perjury or for making a false statement, and if that were to happen based on the cross examination of a person's former lawyer, it would present real concerns about the fairness of the judicial proceedings.

So, the duty to a client and the problems of cross-examining a former client present many pitfalls. Sometimes evidence that helps one client may hurt another client, and then a lawyer sometimes has a conflict about whether or not to disclose that or to use that evidence at trial.

And also there are concerns, post-trial. Sometimes a person does not want to cooperate initially but if the trial does not turn out as they had hoped, at the end of trial, sometimes a person decides that they want to cooperate, and at that point, number one, it might be too late. It may or may not be too late to pursue cooperation depending on what happened at that the trial and the position of the prosecution, but also in post-trial negotiations, these same conflicts of interest can arise for the same reasons that I've discussed.

I'm sure that there are many other ways that a

1 potential conflict of interest could arise in these types of

2 situations, but do you understand the types of conflicts of

3 interest that I'm trying to explain to you today?

4          DEFENDANT DE LA CRUZ:  Yes, Your Honor.

5          THE COURT:  And are you aware that a potential

6 conflict of interest may exist in your case?

7          DEFENDANT DE LA CRUZ:  Yes, Your Honor.

8          THE COURT:  And do you understand the potential

9 hazards to your defense by continuing with Mr. Ramirez as

10 your lawyer?

11          DEFENDANT DE LA CRUZ:  Yes, Your Honor.

12          THE COURT:  And do you understand that you can hire

13 another lawyer or if you are unable to do so, you could

14 appoint or you could request that I appoint a lawyer to

15 represent you in your defense?

16          DEFENDANT DE LA CRUZ:  Yes, Your Honor.

17          THE COURT:  And I'm not going to ask you for

18 purposes of your entire case about whether or not you waive

19 your conflict of interest because I believe that matter is

20 more appropriately resolved by the District Judge unless he

21 refers it to me, but for purposes of your arraignment today,

22 and your detention hearing today, do you waive your right to

23 have a conflict-free representation of these proceedings

24 today?

25          DEFENDANT DE LA CRUZ:  Yes, Your Honor.

1          THE COURT:  Okay.  And for the Record, there may be

2     a conflict of interest that's out there, and that issue will

3     be resolved by the District Court, but for purposes of the

4     Arraignment and the Detention Hearing, I believe that those

5     matters can be resolved without a risk of this potential

6     conflict of interest harming the interests of the Defendant,

7     Mr. DeLaCruz.

8          Now, I previously asked if it's your choice to

9     allow Mr. Guerrero to fill in for Mr. Ramirez for your

10    Arraignment and your Detention Hearing.

11          Is that still your request?

12          DEFENDANT DE LA CRUZ:  Yes, Your Honor.

13          THE COURT:  Okay, having said all of that, I find

14    that there is no present and actual conflict of interest

15    that would prevent me from conducting the Arraignment and

16    the Detention Hearing today with Mr. Guerrero proceeding as

17    Mr. DeLaCruz's lead counsel.

18          Before we do that, Mr. DeLaCruz, do you have any

19    questions about anything that we've talked about today?

20          DEFENDANT DE LA CRUZ:  No, Your Honor.

21          THE COURT:  Okay.  All right.  We're going to start

22    by having your Arraignment.  I'm not going to ask you any

23    questions about your case, but I do need to start by having

24    you placed under Oath, so if you would please place your

25    right hand to be sworn.

1       (Defendant sworn.)

2            DEFENDANT DE LA CRUZ:  I do.

3            THE COURT:  Kendra, I need the Indictment. No, I

4  have it right here. I'm sorry. It's in here.

5            You've been placed under oath, and if you provide

6  false answers to any of the questions I ask, those answers

7  could be used against you and the prosecution for perjury or

8  for making a false statement.

9            What is your true and correct name?

10           DEFENDANT DE LA CRUZ:  First name Ramon, last name

11 DeLaCruz, Jr.

12           THE COURT:  And Mr. DeLaCruz, how old are you?

13           DEFENDANT DE LA CRUZ:  I am 36 years old.

14           THE COURT:  How far did you go in school?

15           DEFENDANT DE LA CRUZ:  Graduated from high school.

16 12th grade.

17           THE COURT:  Okay, and do you read and write

18 English?

19           DEFENDANT DE LA CRUZ:  Yes, I do, Your Honor.

20           THE COURT:  And have you received a copy of the

21 Indictment in the case?

22           DEFENDANT DE LA CRUZ:  Yes, Your Honor, it's right

23 here in front of me.

24           THE COURT:  And have you read the Indictment and

25 have you discussed it with your lawyer?

1              DEFENDANT DE LA CRUZ:  Briefly, Your Honor.

2              THE COURT:  And have you also received a copy of

3    the criminal complaint in your case?  That's the Affidavit

4    that sets forth a summary of the alleged facts.

5              DEFENDANT DE LA CRUZ:  Yes, Your Honor.

6              THE COURT:  Okay. Now, I need to ask a few

7    questions to make sure that you are mentally competent.

8              Have you ever suffered from any type of mental

9    illness?

10             DEFENDANT DE LA CRUZ:  No, Your Honor.

11             THE COURT:  Have you ever had any serious addiction

12   to narcotic drugs or alcohol?

13             DEFENDANT DE LA CRUZ:  No, Your Honor.

14             THE COURT:  Are you taking anything today that

15   might cause you to be confused?

16             DEFENDANT DE LA CRUZ:  No, Your Honor.

17             THE COURT:  Mr. Guerrero, do you believe

18   Mr. DeLaCruz is competent?

19             MR. GUERRERO:  Yes, sir.  He is, Your Honor.

20             THE COURT:  I find him to be so.

21             Mr. Guerrero, does Mr. DeLaCruz waive a formal

22   reading of the Indictment?

23             MR. GUERRERO:  Mr. DeLaCruz, I've gone over the

24   Indictment.  He wants to waive formal reading of the

25   Indictment.  He's intending to enter a plea of not guilty,

1  and we already pretrial dates, and --

2        THE COURT:  Okay.

3        MR. GUERRERO:  -- everything else.

4        THE COURT:  All right, very good.

5        Now, Mr. DeLaCruz, I'm going to summarize the

6  charge for you, but I don't want to know if you committed

7  the offense.

8        The Indictment is the forma accusation charging you

9  with a felony drug trafficking offense, and it alleges that

10  between January 2009 and December 2013, in the Southern

11  District of Texas, you are accused of knowing and

12  intentionally conspiring with other persons to possess with

13  intent to distribute a controlled substance.

14        The Indictment alleges that this violation involved

15  more than 1000 kilograms of marijuana, excuse me, a Schedule

16  I controlled substance.  This alleges, a violation of Title

17  21 of the United States Code, Sections 846 and 841.

18        If you are convicted, you face certain minimum and

19  maximum possible punishments. If convicted, there is a

20  mandatory minimum 10 year period of imprisonment, up to

21  lifetime in prison, without probation, parole or a suspended

22  sentence.  There is also a maximum possible fine of up to

23  $10 million, at least five years of supervised release.

24  There is also a mandatory $100 special assessment, and if I

25  didn't' say it, the five years of supervised release could

1   last the rest of your life.

2           Do you understand the minimum and the maximum

3   possible punishment you face, if convicted?

4           DEFENDANT DE LA CRUZ:  Yes, Your Honor.

5           THE COURT:  And how do you plead, guilty or not

6   guilty?

7           DEFENDANT DE LA CRUZ:  Not guilty.

8           THE COURT:  Thank you.  Your case has been assigned

9   to Senior United States District Judge John D. Rainey.  Your

10  case is indicted out of Victoria.  All of your proceedings

11  will be before Judge Rainey in Victoria, unless your

12  attorneys notify you otherwise.

13          There is a Scheduling Order that gets me some dates

14  and if I could have the original from one of the parties to

15  go over those dates with Mr. DeLaCruz?

16      (Brief pause in proceedings.)

17          Okay, all right.  I have the Scheduling Order.

18  Have you been given a copy of the Scheduling Order,

19  Mr. DeLaCruz?

20          DEFENDANT DE LA CRUZ:  Yes, Your Honor.

21          THE COURT:  Okay, the Scheduling Order sets some

22  dates and some deadlines for your lawyers to file motions

23  and responses, but it also sets your next Court dates.

24          You have a Final Pretrial Conference before Judge

25  Rainey at the Federal courthouse in Victoria, Texas, on

1  December 5th, 2016, at 10:10 in the morning.

2          And you also have a Jury Trial scheduled for

3  December 7th, 2016, at 9:30 in the morning.

4          Do you understand your Court dates?

5          DEFENDANT DE LA CRUZ:  Yes, Your Honor.

6          THE COURT:  All right, now on the issue of

7  detention without waiving your objection to my conducting

8  the Detention Hearing, Mr. Martinez do you have any evidence

9  of witnesses or proffers?

10          MR. MARTINEZ:  We do, Your Honor.  I call a

11  witness.

12          THE COURT:  Okay, all right, so Mr. DeLaCruz and

13  counsel if you could have a seat at counsel table, we'll let

14  the Government call its witnesses.

15          MR. MARTINEZ:  The United States will call Special

16  Agent Steve Greenwell.

17      (Witness sworn.)

18          THE WITNESS:  Yes, ma'am.  I do.

19          THE CLERK:  Thank you.

20          THE WITNESS:  Good afternoon, Judge.

21          MR. MARTINEZ:  May I proceed, Your Honor?

22          THE COURT:  You may.

23          DIRECT EXAMINATION OF STEVEN GREENWELL

24  BY MR. MARTINEZ:

25  Q    Please state your name?

1  A     Steven Greenwell.

2  Q     How are you currently employed?

3  A     I'm a Special Agent with the Department of Homeland

4  Security, Homeland Security Investigations.

5  Q     And how long have you been involved in law enforcement?

6  A     Approximately 18 years.

7  Q     In your career as a law enforcement as law enforcement

8  agent, have you had the opportunity to investigate drug

9  trafficking organizations?

10  A     Yes, sir, I have.

11  Q     On many, or few occasions?

12  A     Many occasions.

13  Q     Are you familiar with the Ramon DeLaCruz, Jr., case?

14  A     Yes, sir, I am.

15  Q     Are you the case agent on the case?

16  A     Yes, sir, I am.

17  Q     Let me take you back to the beginning of this

18  investigation.  This case involves a conspiracy, is that

19  correct?

20  A     Yes, sir, it does.

21  Q     Can you please tell the Court the dates that the

22  conspiracy spans?

23  A     At present, it spans from 2008, beginning of 2008 to

24  the end of 2013.

25  Q     And the Government in the Indictment alleged January

1  2009 to on or about December 2013, is that correct?

2  A    Correct, yes, sir.

3  Q    During the course of this investigation, did you

4  identify an individual by name of Ramon Beltran, Sr.?

5  A    Yes, sir, we did.

6  Q    And who is Mr. Beltran, Sr.?

7  A    He is the head of an organization, what I refer to as

8  the Beltran Drug Trafficking Organization that operates or

9  operated out of Rio Grande City, Texas.

10 Q    Did this organization have any connections to drug

11 cartels in the country of Mexico?

12 A    Yes, sir, they did.

13 Q    With specifically, what cartel?

14 A    The Gulf Cartel.

15 Q    Is the Gulf Cartel known by law enforcement in the

16 United States as a dangerous cartel?

17 A    Yes, sir, they are.

18 Q    Are they involved in narcotics trafficking?

19 A    Yes, sir, they are.

20 Q    Are they involved in kidnapping?

21 A    Yes, sir, they are.

22 Q    Are they involved in murder?

23 A    Yes, sir, they are.

24 Q    And during the course of your investigation, did you

25 learn whether or not Mr. DeLaCruz, Jr., was tied in to the

1  Beltran organization?

2  A    The investigation has revealed that Mr. DeLaCruz was

3  working directly with individuals that were directly linked

4  to the Gulf Cartel, Gulf Cartel members, yes, sir.

5  Q    And was Mr. DeLaCruz, at one point, a law enforcement

6  official?

7  A    Yes, sir, he was.

8  Q    Where was he employed?

9  A    He worked as a Starr County Deputy Sheriff for, I want

10  to say, 13 years and then he worked as a Rio Grande City

11  Police Officer, investigator for a couple of years prior to

12  being arrested.

13  Q    When Mr. DeLaCruz was working for this organization,

14  was he also employed as a law enforcement official?

15  A    Yes, sir, he was.

16  Q    Are there aspects of public corruption involved in this

17  investigation?

18  A    Yes, sir.

19  Q    Specifically, is there evidence that Mr. DeLaCruz

20  provided the Beltran Drug Trafficking Organization with

21  radios?

22  A    He did, yes, sir.

23  Q    And what type of radios, are we talking about?

24  A    These were two hand-held Motorola radios that were

25  later recovered that had functioning active police

1  frequencies in those radios.

2  Q    Are these law enforcement type of radios?

3  A    Yes, sir, they are.

4  Q    Would this function allow the drug trafficking

5  organization to listen to the communications of law

6  enforcement?

7  A    Yes, sir, it would.

8  Q    Is that why these radios were so important to the

9  organization?

10  A    That is correct.

11  Q    In reference to other aspects of public corruption, did

12  Mr. DeLaCruz use his police issued vehicle to assist this

13  drug organization?

14  A    Yes, sir.  We've uncovered information that indicates

15  Mr. DeLaCruz used his assigned Starr County vehicle at

16  whatever point in the conspiracy that it was, whether it was

17  a Ford F-150 or a Ford Expedition, he used that vehicle

18  while participating in illicit conduct with the Beltran Drug

19  Trafficking organization.

20  Q    What specifically would he do?

21  A    We have information to indicate that the Defendant

22  would conduct counter surveillance through the highways

23  communicating with Beltran's as well as other members of the

24  drug trafficking organization to notify them of law

25  enforcement presence.  He, at least on one occasion that we

1  know, came to the Beltran Ranch and picked up marijuana from

2  the Beltrans that represented payment for some of the

3  services that he had performed, as well as other meetings.

4  There were payments that were made with, between the

5  Beltrans and the Defendant, and other co-conspirators that

6  took place in the presence of Mr. DeLaCruz's patrol vehicle.

7  Q    Is it your testimony that Mr. DeLaCruz was, at times,

8  paid by this organization with narcotics?

9  A    That is correct, yes, sir.

10 Q    Did he assist this organization by falsifying police

11 reports?

12 A    That is correct, he did.

13 Q    Did he assist this organization by alerting the

14 organization of law enforcement search warrants?

15 A    Yes, sir, he did.

16 Q    And any specifics in reference to how he assisted them

17 in reference to the search warrants that law enforcement was

18 executing?

19 A    Yes, sir.  I guess, a specific occasion was

20 October/November of 2011, the Starr County HIDTA, as a

21 result of some observations made by Border Patrol Agents, as

22 well as other law enforcement officials executed a search

23 warrant at the Beltran Ranch in Rio Grande City.  We have

24 information that indicates that Mr. DeLaCruz later came on

25 to the ranch in a law enforcement capacity to assist other

1  individuals conducting the search of the ranch and placed a

2  call to Ramiro Beltran, kept his phone in shirt pocket open,

3  with the connection open the entire time the search was

4  taking place so as to reveal to Ramiro Beltran and others

5  the conduct that was occurring on their ranch.

6  Q    Did this allow the drug trafficking organization to

7  identify law enforcement agents by face and name?

8  A    I'm sure it did, by name, surely. It exposed tactics.

9  It probably exposed radio traffic and that sort of thing,

10 yes, sir.

11 Q    Did this place the law enforcement community in danger?

12 A    Yes, sir, it did.

13 Q    Is there any evidence that you learned in the course of

14 your investigation that Mr. DeLaCruz was involved in what is

15 called ripping of narcotics?

16 A    Yes, sir.

17 Q    Would you please explain what the ripping of narcotics

18 means first?

19 A    Yes, sir.  The ripping of narcotics is whereby the

20 organizations will steal loads of dope from other drug

21 trafficking organizations and then sell those loads on their

22 own.

23 Q    And did Mr. DeLaCruz do this working under the umbrella

24 of the law enforcement office?

25 A    Mr. DeLaCruz did do this as a law enforcement officer

1   and facilitated others in doing the same by staging law

2   enforcement takedowns.

3   Q    Are there any cooperating Defendants involved in this

4   investigation?

5   A    Yes, sir, there are.

6   Q    And are these individuals who have personal knowledge

7   of the inner workings of the Beltran drug trafficking

8   organization?

9   A    Yes, sir, they do.

10  Q    Are these individuals who have sensitive information

11  and first-hand knowledge of Mr. DeLaCruz's participation in

12  this organization?

13  A    Yes, sir, they do.

14  Q    From these individuals, did you learn whether or not

15  Mr. DeLaCruz abused narcotics, himself?

16  A    It was revealed that at least on one occasion, in a

17  pre-planning for drug rip that Mr. DeLaCruz appeared to be

18  under the influence of narcotics.  He was actually giving

19  commands to other individuals as to what they were to do and

20  how they were going about it doing it.  It was very erratic

21  behavior and loud shouting that led other individuals to

22  believe that he was under the influence of narcotics.

23  Q    During the course of your investigation, did you learn

24  whether or not this organization was involved in the

25  kidnapping and murder of an individual?

1  A    During the course of this investigation, we learned

2  that other individuals were involved in a kidnap and murder

3  of individuals in the Rio Grande Valley.  Those persons that

4  were involved in that conduct took weapons to the Beltran

5  Ranch and asked that the Beltrans hide those weapons, three

6  rifles, in particular, on the ranch.  It was actually three

7  rifles as well as tactical vests, M4 magazines fully loaded

8  with 223 rounds.

9        Once the Beltrans learned that the weapons, what they

10 had been used in, shortly after arrival of the weapons, it's

11 been reported that they called the Defendant, Ramon

12 DeLaCruz, to dispose of the weapons essentially, and

13 six/seven hours later, the Defendant DeLaCruz came to the

14 ranch, took the weapons, questions unasked, took the weapons

15 and disposed of them, provided them to a gun store or

16 something of that nature in the Rio Grande City area.

17 Q    Has law enforcement been able to identify and

18 furthermore seize those weapons used in this murder?

19 A    No, sir, they have not.

20 Q    Are those weapons evidenced I a pending murder

21 investigation?

22 A    They are evidence in a -- I don't know if the murder

23 investigation is pending.  I do know that the sentencing of

24 some of those individuals that have been convicted are

25 pending.

1  Q    Nonetheless, are they evidence used in a murder?

2  A    Yes, sir.  Absolutely.

3  Q    Is there an ongoing investigation by the Department of

4  Homeland Security, in reference to Mr. DeLaCruz's

5  involvement in cocaine conspiracy

6  A    There is, yes, sir.  We received information that in

7  addition to working jointly with the Beltran organization to

8  smuggle marijuana, to rip marijuana, and smuggle marijuana

9  to provide false reports to cover-loads of ripped marijuana,

10 that the Defendant, Mr. DeLaCruz, also worked with another

11 organization out of the Rio Grande Valley that specializes

12 in the smuggling of cocaine.

13 Q    The main principal of the drug trafficking

14 organization, Mr. Ramiro Beltran, Sr., has he been indicted?

15 A    No, sir, he has not.

16 Q    Has there been a criminal complaint issued seeking his

17 apprehension?

18 A    Yes, sir.  He was indicted in January of 2016.

19 Q    Is there an active warrant for Mr. Beltran?

20 A    Yes, sir, there is.

21 Q    And is he currently a fugitive from justice?

22 A    He is, yes, sir.

23 Q    Do you have any information as to his whereabouts?

24 A    I believe based on six/seven months of investigation

25 that I've done as well as frankly phone calls that I've

1 received from the fugitive, some of which have taken place

2 in my opinion, to threaten me, I believe he is currently in

3 Mexico.

4 Q    So, Mr. Beltran, directly contacted you?

5 A    Yes, sir, on several occasions.

6 Q    For what purpose?

7 A    I think to intimidate me.  I think to -- the most

8 recent phone call was, in my opinion, to threaten me.

9 Q    And in reference to Mr. Beltran being a fugitive, do

10 you have any evidence to suggest that Mr. DeLaCruz has been

11 in contact with this fugitive?

12 A    I do, yes, sir.

13 Q    Please tell the Court about that?

14 A    At the Defendant's arrest, post-Miranda, he provided us

15 with telephone numbers both for his personal and his work

16 cell telephone.  We have issued subpoenas to the carrier of

17 that company and requesting tolls, requesting call record

18 activity for those cell phones for a period of six months,

19 possibly more.

20      The toll record activity from the personal cell phone

21 used by Mr. DeLaCruz indicates that there was a lot of

22 telephone traffic between Mr. DeLaCruz and Jacqueline

23 Beltran, who was Ramiro Beltran's daughter.  That call

24 activity focuses on a couple of dates.  In particular, April

25 2nd of this year, after Mr. Beltran became a fugitive, there

1  is a lot of call activity between the two cell phones,

2  between Ramon DeLaCruz and Jacqueline Beltran's cell phone.

3      When you look at travel data of Jacqueline Beltran, she

4  is in Mexico at those very times, in April of 2016,

5  specifically April 1st and 2nd of 2016, as well as May of

6  2016, so it's my belief Jacqueline Beltran is 20 years old,

7  maybe, has a husband.  It's my belief that the Defendant is

8  calling Jacqueline Beltran as either a go-between to pass

9  information or more accurately, I believe, essentially

10  what's happening is she is passing her phone to her Dad so

11  that the fugitive can talk to the Defendant.

12  Q    So, Jacqueline Beltran is in Mexico at the exact same

13  time as Mr. DeLaCruz is calling her phone number?

14  A    That's correct, sir.

15  Q    And is it your belief that Mr. Beltran, the fugitive,

16  is currently living in the country of Mexico?

17  A    That is correct, sir.  There is something I would like

18  to add.  Following the arrest of Mr. DeLaCruz, a consent

19  search was conducted at the residence, whereby his wife,

20  Mrs. DeLaCruz provided law enforcement officers with consent

21  to search their home.  At the bedside of Mr. DeLaCruz, in a

22  trash can was found what I believe to be, I didn't find it

23  myself, but what I was told by other agents, to be Pacer

24  information.  That is Court documentation that was printed

25  out to reveal case information about specific cases.  In

1  fact, those documentations show Ramiro Beltran's information

2  on them, and it's my belief that he's checking up on

3  Ramiro's case for him so as to pass that information to the

4  fugitive.

5  Q    Your mention the Defendant's wife.  Does she have any

6  ties to the country of Mexico?

7  A    I'm sorry?

8  Q    Your mention Mr. DeLaCruz's wife.  Does she have any

9  ties to the country of Mexico?

10 A    Yes, sir.  It is my understanding she has family in

11 Mexico.

12 Q    And in reference to the amount of narcotics that

13 Mr. DeLaCruz's conspiracy involves, what is the weight we're

14 talking about here?

15 A    We are talking around the range of 60,000 pounds of

16 marijuana.

17         MR. MARTINEZ:  Nothing further, pass the witness,

18 Your Honor.

19         THE COURT:  Okay. Mr. Guerrero, any cross exam?

20         MR. GUERRERO:  Yes, Your Honor, if I may.

21          CROSS-EXAMINATION OF STEVEN GREENWELL

22 BY MR. GUERRERO:

23 Q    Agent, I didn't catch your name, sir. What was it?

24         THE COURT:  Just to keep in our normal practice

25 here in Corpus Christi, if you would please --

1          MR. GUERRERO:  Talk at the podium, Judge?

2          THE COURT:  If you would ask questions from the

3    podium?

4          MR. GUERRERO:  Absolutely, Judge.

5          THE COURT:  Okay.

6          MR. GUERRERO:  I apologize.

7          THE COURT:  It's okay.

8    BY MR. GUERRERO:

9    Q    Agent, I'm sorry, I didn't catch your name?

10   A    Yes, it's Steven Greenwell.

11   Q    Agent Greenwell, you testified earlier about the

12   Beltran DTO and Mr. Ramon DeLaCruz's contacts with the

13   Beltran DTO.  Do you recall that testimony?

14   A    Yes, sir.

15   Q    Okay, and specifically, you referenced Mr. Beltran, the

16   fugitive.  Now, I didn't catch Mr. Beltran, the fugitive's

17   first name.  What is his first name?

18   A    Ramiro.

19   Q    Ramiro.

20   A    That's Senior, sir.  His son has also been indicted,

21   Ramiro Beltran, Jr.

22   Q    And he's in custody, right?

23   A    No, sir. He's on bond.

24   Q    Okay, now these contacts that you refer to, is this

25   referring to only Mr. Beltran or are there Gulf Cartel

1  contacts that you can specifically refer to that you

2  referenced in your blanket testimony?

3  A    These are individuals that were working directly with

4  Gulf Cartel members, Plaza bosses, individuals that were

5  bringing marijuana into the United States.

6  Q    But relating directly to Mr. Ramon DeLaCruz, who

7  specifically is he contacting in the Gulf cartel that you

8  are saying is in contact with him?

9  A    He is contacting a confidential source of information.

10  Q    Okay, so this particular confidential source of

11  information that you are referencing, sir, is that someone

12  that you have as a confidential source that is with the Gulf

13  Cartel, is that what you are trying to say?

14  A    Once was, yes, sir.

15  Q    Okay.  And this contact, is it ongoing or it happened

16  in the past?

17  A    I don't understand the question.

18  Q    Well, the question is, I mean, you referenced

19  surveillance and you referenced calls by Ramiro Beltran,

20  Sr., but are there calls that you monitored or you've

21  identified where Mr. Ramon DeLaCruz is contacting Gulf

22  Cartel members, you know, in the recent past, as opposed to

23  at the time and places of these particular events, which is

24  in 2010, 2011, 2012, almost four years ago?

25  A    Yes, sir.  Those contacts would have been at that time,

1  yes, sir.

2  Q    At that time?

3  A    Yes, sir.

4  Q    Are these contacts that are occurring in 2011, 2012,

5  the dates and times that are written up in the Complaint, is

6  that correct?

7  A    Yes, sir.

8  Q    But related to contacts in the near present?

9  A    In the recent --

10 Q    In the recent present which you've described

11 April 12th, 2nd, 2016, a Jacqueline Beltran.  Are there

12 contacts that you are aware of that my client is making

13 with, as you allege, Gulf Cartel members, Beltran DTO

14 members, are there specific contacts that he's making in the

15 recent past?

16 A    Excluding time he has obviously been in custody?

17 Q    Obviously.

18 A    Okay.  I have no information that would indicate to me

19 that the Defendant has had any contact directly with Gulf

20 Cartel members in the recent past.  The contacts he had with

21 respect to Jacqueline Beltran was made to illustrate the

22 fact that the Defendant was communicating with a Co-

23 Defendant and fugitive in the case, sir.

24 Q    And up to the Beltran contact and I just wanted to talk

25 about, the next thing you spoke about --

1  A    Yes, sir.

2  Q    -- the two hand-held Motorola radios?

3  A    Yes, sir.

4  Q    Have those been recovered?

5  A    Yes, sir, they have.

6  Q    Okay, and those radios that were recovered, who had

7  them in their possession?

8  A    They were at the -- they were found at the residence of

9  a Beltran during the consent search pursuant to the

10 execution of an arrest warrant.

11 Q    And how is it again that the radios were determined to

12 have been given to the Beltran DTO by ways of Ramon

13 DeLaCruz?

14 A    Two-fold, sir.  There is currently, out of 13

15 cooperating individuals in this investigation, there's 8 of

16 whom are giving information directly related to the

17 Defendant Ramon DeLaCruz.  I don't want to misspeak but with

18 respect to the radios, three or four have directly said that

19 the Defendant, Ramon DeLaCruz, provided those radios to the

20 Beltran organization.  In addition to that, we've done

21 research into the radios and note the research of those

22 radios has revealed that the radio was assigned to one

23 particular Deputy at the Starr County Sheriff's Office some

24 time ago.

25      That Deputy, as per her statement, loaned that radio to

1  another Deputy.  That Deputy was later in a car accident.

2  The individual that responded to that Deputy in order to

3  watch over his possessions, his vehicle, his Government

4  issued equipment that was in the car, because he had to

5  leave in an ambulance was the Defendant Ramon DeLaCruz, so

6  Ramon DeLaCruz was the last individual to actually come in

7  contact with that radio coupled with the information we have

8  from corroborating sources of information that he gave that

9  radio or radios to the Beltran DTO.

10  Q    Just to be clear, the Deputy who had it in his or her

11  possession prior to Ramon DeLaCruz taking over that, that

12  Deputy -- did that Deputy ever report it missing, stolen?

13  A    That Deputy reported that she loaned it to the other

14  officer who was later in an accident and then that officer

15  wrote a report that indicated that he had the accident and

16  the Defendant was the last one as far as he knew to see the

17  radio in his vehicle.

18  Q    And this occurred, about what time frame?  Again, is

19  this an event that occurred in 2011?

20  A    Yes, sir, in the far past, yes, sir.

21  Q    Far past.  Well, the use of the Starr County for

22  counter surveillance, as alleged, that's gleaned off of

23  confidential sources?

24  A    Correct, yes, sir.

25  Q    Okay, and that again, is that activity that is in the

1   recent past or that activity that again, 2011 and 2012?

2   A    Correct, sir.  The distant past during the conspiracy,

3   itself.

4   Q    Okay.  Now, there's allegations that you made and they

5   are also in the complaint about marijuana at the Beltran

6   Ranch.  Again, the alleged payment of marijuana to my

7   client.

8   A    Yes, sir.

9   Q    Now, this is something, again, it occurred, again, in

10  2011, 2012?

11  A    Yes, sir, that's correct.

12  Q    And this marijuana that was -- the way the Complaint

13  reads, it was paid to Mr. Ramon DeLaCruz as payment for

14  services rendered, I gather?

15  A    Yes, sir.

16  Q    This is not something that was seized.  This is just

17  something you got from a confidential source?

18  A    From several, yes, sir.

19  Q    Several confidential sources.  Did you get it from the

20  confidential source who actually gave him the marijuana or

21  if you are at liberty to say?

22  A    I can't recall, sir.

23  Q    Okay, so there's no direct evidence of, one, the

24  marijuana, and then a person actually saying, "I gave him

25  the marijuana?"

1  A    I do not have that information.  I have information

2  that an individual observed that actually occurring.

3  Q    Okay, now there's a -- you went through a recitation or

4  an explanation, that is to say, of the falsifying of the

5  police report, assisting in a warrant warnings and that type

6  of information.  But that again, that's information or

7  occurrences that occurred in 2011 to 2012?

8  A    Yes, sir, in the past.

9  Q    Okay, in the past, and you specifically mentioned my

10  client placing a call and having the call, I guess, on while

11  he was actually conducting his assistance of the law

12  enforcement. Did I understand that correctly?

13  A    Yes, sir.

14  Q    Okay, and that information is obtained from what

15  source, from a confidential source, again?

16  A    Multiple confidential sources, yes, sir.

17  Q    Have you been able to track the time and place of the

18  marijuana seizure and his phone logs indicate that he did,

19  in fact, do what he is being accused in assisting in this

20  matter?

21  A    No, sir, as you have duly indicated, it's so far in the

22  past that there's, you know, it's unknown as to what

23  telephone number was being used at the time.

24  Q    Now, the ripping of narcotics, this law enforcement

25  take down, if you remember, and I'm working off of memory,

1  too, but was he, Ramon DeLaCruz working in drug interdiction

2  at that time?  Was that part of his tasks?

3  A    It's my understanding he was working in the District

4  Attorney's violent crime task force, which is a large

5  umbrella, so it's very possible, yes sir, he was working in

6  counter narcotics, as well as probably a wide variety of

7  other areas.

8  Q    So, seizing narcotics or doing raidings or assisting in

9  raidings was just part and parcel of what his assignments

10  were?

11  A    Absolutely, yes, sir.

12  Q    But your contention is that there was some document

13  altering that occurred in the ripping of narcotics?

14  A    Correct, sir.

15  Q    And, again, I think for the same time frame, it was

16  back in 2011 and 2012, would that be the time frame?  That's

17  the way --

18  A    Yes, sir, and possibly in early, mid-2013.  Yes, sir.

19  Q    Okay, now let's talk about the rifles.  That, again, is

20  something that occurred in 2011 and 2012, more or less?

21  A    Yes, sir, 2011, it would have been because the

22  magazines were in the HIDTA search warrant that I referred

23  to earlier in which Mr. DeLaCruz reportedly has his cell

24  phone on, they do actually find the magazines, the vests

25  buried in bunkers.  The rifles weren't found and the

1  information later suggests why.

2  Q    Okay, so weapons were found in a bunker as you describe

3  it but not the murder weapons?

4  A    No, sir, not weapons. The tactical vests, magazines

5  loaded with 223 ammunition but no weapons.

6  Q    But why is it that you are able to identify this gear

7  that you found is linked to this kidnapping that occurred in

8  Mexico?  How is it that the connection is being made? Is it

9  -- go ahead.

10  A    It's being made after the fact.  What's happened is a

11  result of several investigations including this particular

12  investigation and the research that has been done by the

13  various investigators.  We've been able now to link together

14  several different incidents, several different episodes that

15  all have cross-over.

16  Q    Okay, now, it's not your assertion though that

17  Mr. Ramon DeLaCruz participated in any violence in Mexico or

18  on this side of the border.  Is that your assertion?

19  A    No, sir, I didn't -- I think I understood the first

20  part of your question?

21  Q    Basically, was he involved, other than to say, other

22  than the allegation being these three weapons were handled

23  by Mr. DeLaCruz and you are asserting that they were

24  disposed by him, you are not saying that he was involved in

25  any acts of kidnapping, murder, things of nature?

1    A    I have no information to indicate at this time that

2    Mr. DeLaCruz was involved in the kidnap and murder that I

3    testified to earlier.

4    Q    And so, let's go through Mr. Ramiro Beltran, Sr.?

5    A    Yes, sir.

6    Q    He's a fugitive and he's been indicted, is that

7    correct?

8    A    That's correct, sir.

9    Q    Okay, is he assisting the Government in any way,

10   Mr. Ramiro Beltran, Sr., is he a confidential source of the

11   Government?

12   A    He's currently a fugitive, sir.

13   Q    Currently, a fugitive, okay.  He's not assisting the

14   Government in any way?

15   A    He is currently a fugitive who I believe is in Mexico.

16   Q    Okay, now going to the telephone call that you

17   specifically referenced which is April 2nd, 2016, is there,

18   do you-all have any information regarding the content of the

19   conversations that occurred between Jacqueline Beltran and,

20   as you allege, Ramon DeLaCruz?

21   A    No, sir.  Just to be clear, these weren't actual

22   intercepts.  This is toll record data.  This is toll record

23   data that shows a tremendous amount of telephone activity

24   between the personal cellular telephone owned by

25   Mr. DeLaCruz and that that is owned and assigned to

1  Jacqueline Beltran, Ramiro's daughter.

2  Q    Obviously, there was telephone communication because

3  you referenced it on April 2nd 2016?

4  A    Yes, sir.  That's what the phone service provider

5  indicates, yes, sir.

6  Q    Were there conversations prior to that date, prior to

7  Mrs. Jacqueline Beltran being in Mexico?  Were there, does

8  the telephone records indicate telephone traffic between

9  Mr. Ramon DeLaCruz and Jacqueline Beltran?

10  A    No, sir, not prior to April 2nd.

11  Q    Does it indicate telephone communications after April

12  2nd between Jacqueline Beltran and Ramon DeLaCruz?

13  A    It does, sir.

14  Q    It does, so wouldn't the conversations be consistent

15  with either friendship or, you know, innocuous phone calls

16  between two parties?

17  A    It would on the surface. However, there is really only

18  three, four dates maximum in which those telephone calls

19  occur.  That's April 1st, April 2nd and the phone calls in

20  April 2nd only occur up to about mid-afternoon.  And then

21  there is some more telephone activity between the two

22  cellular telephones in May.  I don't remember the specific

23  date, so when you go and look then as investigator at the

24  travel activities of Jacqueline Beltran, who is the holder

25  of that cell phone, and she happens to be in Mexico on April

1  1st and 2nd and actually crosses just shortly after the

2  telephone calls terminate, as well as in Mexico in May, and

3  again, I don't remember the specific date, but it is exactly

4  consistent with the telephone calls, it leads a prudent

5  person to believe, given the situation that Mr. DeLaCruz is

6  communicating to the fugitive through his daughter.

7  Q    And with reference to documents found in the household,

8  the Pacer documents, were any of those documents, documents

9  that were considered or would be considered confidential or

10 are those documents public information?

11 A    It's my understanding that Pacer information is public

12 information.

13 Q    Now, my last question, sir, relating to the allegation

14 that my client is involved in the transport of the 1600

15 pounds of marijuana, more or less, where are these

16 estimates, how are the estimates being gathered?

17 A    Well, when Mr. Martinez asked that question, the amount

18 I threw out was 60,000.  That amount --

19 Q    Oh, it was 60,000, sorry.

20 A    Yes, sir.  That amount is an estimate that is based on

21 the information received from confidential sources of

22 information and calculations that were made based on that

23 information in the duration of the conspiracy.  It would not

24 be possible for me to estimate the amount of marijuana that

25 your Defendant would have been responsible.

1    It's safe to say, I would assume that he didn't

2  participate in all 60,000 but then I don't know.  Evidence

3  will show this is a very prolific smuggling organization.

4  They used a lot of trailers, horse trailers, flatbed

5  trailers, and they ran a lot of loads as evidenced by

6  electronic surveillance at checkpoints as evidenced by

7  confidential source information, as evidenced by law

8  enforcement interdictions that have occurred throughout

9  Texas.

10    The information would indicate that your client

11  participated within that conspiracy, but on how many loads,

12  I can't say, sir.  It is definitely in excess of the 1000

13  kilograms that the Indictment states.  I say, far in excess.

14  Q    But his role was not that of a leader, is that your

15  position, that he led this organization somehow?  That's not

16  what I glean from what you shared.

17  A    He was not the leader of the Beltran organization but

18  it's clear from corroborator information that when meetings

19  took place regarding how a load was going to be ripped, when

20  it was going to be ripped, Mr. DeLaCruz was the individual

21  that was in charge of those decisions.

22  Q    Well, when you say "meetings," meetings with law

23  enforcement or meetings --?

24  A    No, sir, these were meetings with the rip crew.

25          MR. GUERRERO:  I'll pass the witness, Judge.

1          THE COURT:  Anything further, Mr. Martinez?

2          MR. MARTINEZ:  No, Your Honor.

3          THE COURT:  Thank you for your testimony.

4          THE WITNESS:  Yes, Judge.

5          THE COURT:  You can step down.

6     (Witness steps down.)

7          THE COURT:  Mr. Martinez, do you have any further

8  witnesses?

9          MR. MARTINEZ:  No, Your Honor.

10          THE COURT:  All right, Mr. Guerrero, do you have

11  any witnesses on the issue of detention?

12          MR. GUERRERO:  Yes, Your Honor, I have Mrs. Ima

13  Garcia, a longtime friend of the family, resident of Rio

14  Grande City for over 40 years.  I'd like to have her sworn

15  in as a witness.

16          THE COURT:  Okay.  What was her name again?

17          MR. GUERRERO:  Ima Garcia.

18          THE COURT:  Ms. Garcia, if you could please

19  approach the witness stand on this side over here.  You can

20  take your oath when you get to the Kleenex box there, and

21  then after that, you may have your seat.

22          THE CLERK:  Please raise your right hand?

23     (Witness sworn.)

24          THE WITNESS:  I do.

25          THE CLERK:  Please come forward.

1          THE COURT:  You can walk up around this way and

2    watch your step because you are stepping up.

3          MR. GUERRERO:  I apologize, Judge.  I'm so

4    accustomed to being in McAllen and we sit over there.

5          THE COURT:  Understood, it's fine.  You'll get used

6    to it here, shortly.

7                DIRECT EXAMINATION OF IMA GARCIA

8    BY MR. GUERRERO:

9    Q    Ms. Garcia, can you state your name and address for the

10   Record?

11   A    Ima Garcia, physical address is XXXX XXXX XXXXXXX XX,

12   Rio Grande City.

13   Q    Okay, and Ms. Garcia, how are you employed?

14   A    I work at a law firm.

15   Q    Let's talk with the DeLaCruz family.  How long have you

16   known the DeLaCruz family?

17   A    Over 40 years.

18   Q    Okay, how long have you lived in Rio Grande City?

19   A    Since 1970.

20   Q    1970, and you got married in Rio Grande, right?

21   A    Starr County.

22   Q    Starr County, Rio Grande City.  And do you know

23   Mr. Ramon DeLaCruz, first?

24   A    Yes.

25   Q    Okay, and just for the Court's information, how would

1  you describe Ramon DeLaCruz, in brief words?

2  A    He's a decent person. He's truthful and he's a caring

3  person.

4  Q    And during the time that you've known him, do you know

5  about his career, what type of career he picked?

6  A    I know that he's been in law enforcement for quite a

7  while.

8  Q    Okay, and his general reputation in the community, how

9  would you describe that for the Court?

10  A    He's well liked. He's respected.

11  Q    Okay, does he have a family of his own?

12  A    He does.

13  Q    And do you know how many children does he have?

14  A    Well, the household, he's got a set of twins which are

15  boys.

16  Q    Yes.

17  A    And he's got an older son, and then there's two other

18  -- well, there were two other children living in the

19  household.  One is married now.

20  Q     Okay, and Mr. Ramon DeLaCruz, as far as you know,

21  provides for that family, is that correct?

22  A    He does.

23  Q    He's married to Norma DeLaCruz?

24  A    Yes.

25  Q    And when you say there were two other children, those

1  are Norma's children that are in the household?

2  A    Yes, from a previous marriage.

3  Q    From a previous marriage.  Mr. Ramon DeLaCruz, do you

4  know whether he has family in Mexico?

5  A    No, I'm not aware of any family in Mexico.

6  Q    So, he basically has no ties to Mexico?

7  A    No, not all that I know of, no.

8  Q    And so far as his family, his extended family, how many

9  brothers and sisters does he have?

10 A    He's got sisters.

11 Q    How many sisters does he have?

12 A    There are five.

13 Q    Five sisters.  Wow.  And where do they live, if you

14 know?

15 A    They live in the vicinity, Garciasville.

16 Q    Garciasville?

17 A    Uh-huh.

18 Q    Which is pretty much just down the road?

19 A    About 8 miles east of Rio Grande.

20 Q    And so it's considered part of Starr County?

21 A    Correct.

22 Q    And does his father and mother still live there?

23 A    Yes.

24 Q    Ms. Garcia, is there any reason that you know of that

25 you would be concerned that Ramon DeLaCruz would not make

1  Court appearances?

2  A    No, I'm sure he would.

3  Q    Or, for some reason decide he was not going to go ahead

4  and show up and take flight? Is there anything that would

5  cause you --

6  A    No concern at all, no.

7  Q    Okay.

8        MR. GUERRERO:  I'll pass the witness, Judge.

9        MR. MARTINEZ:  No questions, Your Honor.

10        THE COURT:  Ms. Garcia, all right, thank you for

11  your testimony.  You can step down.

12    (Witness steps down.)

13        THE COURT:  Mr. Guerrero, any further witnesses?

14        MR. GUERRERO:  I'll be asking Mr. Ramon DeLaCruz's

15  aunt to step forward.

16        THE COURT:  Okay, and her last name is?

17        MR. GUERRERO:  Mrs. Rebecca Saenz.

18        THE COURT:  Ms. Saenz, if you could step forward,

19  please?

20        THE CLERK:  Please raise your right hand?

21    (Witness sworn.)

22        THE WITNESS:  I do.

23        THE CLERK:  Please come forward?

24        DIRECT EXAMINATION OF REBECCA SAENZ

25  BY MR. GUERRERO:

1    Q    Mrs. Saenz, good afternoon.  Can you state your full

2    name and address for the Record?

3    A    Rebecca F. Saenz, XXX XXXXXXX XXXXX, Rio Grande City,

4    Texas.

5    Q    And what's your relationship to Ramon DeLaCruz?

6    A    I'm his Aunt.

7    Q    And, of course, you've known him since he was a baby?

8    A    Yes.

9    Q    Did you ever have an opportunity to take care of him?

10   A    Yes.

11   Q    And how old was he when you were taking care of him?

12   A    A baby.  I was 10.  He was born when I was 10, so.

13   Q    So, you are his Aunt.  You were participating in his

14   care. Is the DeLaCruz family, is that the way you guys are,

15   real tightknit?

16   A    We are.

17   Q    Okay, so everybody is just as you see right there.

18   Everyone gathers around to help a member of the family.  Is

19   that correct?

20   A    Yes, yes we do.

21   Q    Now, does the Cruz family have family in Mexico?

22   A    No, not that I know of.

23   Q    Okay, so the entire family is there in the Rio Grande

24   City area?

25   A    Yes.

1  Q    Now, describe for the Court, in your opinion, your

2  nephew's character or way of being?

3  A    He's a good father and a good provider.  He was always

4  working, never known to get in any issues or any problems.

5  Q    Is the type of person that makes sure he stays around

6  to take care of his family?

7  A    Oh, yes.

8  Q    How many children does Ramon have?

9  A    He has three of his own and two stepchildren.

10  Q    Okay, and he's got his twins, of course.  How old are

11  the twins?

12  A    The twins are three.

13  Q    Okay, and the --

14  A    His older boy is 12, I mean, 13.

15  Q    And he provides for them?

16  A    Yes, yes, he does.

17  Q    And you do believe that Ramon is the type of person

18  that would not show up for Court Hearings?

19  A    No, sir.

20  Q    Okay.  Do you believe that if he's asked to show up, he

21  will show up?

22  A    He will.

23  Q    Okay, and you as a family member, are you willing to

24  also sign, maybe not as a surety, but as a responsible third

25  party for Ramon DeLaCruz?

1    A    Yes, sir.

2    Q    Now, a responsible third party means you got to be just

3    that, make sure he knows of the settings, and make sure he

4    shows up. You understand this responsibility?

5    A    Yes.

6    Q    As far as Ramon's behavior with his own children, how

7    would you describe that for the Court?

8    A    Good.  He was a good father, like I said.

9    Q    Okay, does he have any, and I know I'm asking a lot of

10   his Aunt, does he have any alcohol issues, drug issues?

11   A    No, not that I know of, no.

12   Q    Has he ever appeared to you to be as it's described

13   here by the case agent, you know, like if he's on some

14   substance that he shouldn't be on?

15   A    Never.

16   Q    Never, okay.  Do you still communicate pretty regularly

17   with him?

18   A    Well, not now, but when we would get together every

19   other weekend as a family.

20   Q    And you expect to have the same type of pattern, every

21   other weekend you'll get together, so you will be able to

22   actually keep an eye on him?

23   A    Yes, sir.

24   Q    Okay.

25          MR. GUERRERO:  I'll pass the witness, Judge.

1              THE COURT:  Okay.

2                   CROSS-EXAMINATION OF IMA GARCIA

3   BY MR. MARTINEZ:

4   Q    Just one question, Mrs. Saenz, do you know whether or

5   not, his wife has any family in Mexico?

6   A    I don't know.

7              MR. MARTINEZ:  No further questions, Your Honor.

8              THE COURT:  I have a question.

9              Does anyone in the family in Mr. DeLaCruz's family,

10  have any drug trafficking convictions?

11             THE WITNESS:  Not that I know of.

12             THE COURT:  Not that you know of.  Okay.

13             All right, thank you for testimony.  You may step

14  down.

15             Is there anything else, Mr. Guerrero?

16             MR. GUERRERO:  Nothing else, Your Honor.

17             THE COURT:  Argument from the Government?

18             You may step down, I'm sorry.

19             THE WITNESS:  Sorry.

20        (Witness steps down.)

21             THE COURT:  Go ahead.

22             MR. MARTINEZ:  Yes, Your Honor, in reference to

23  this particular case, this is a case that obviously spans

24  several areas, as indicated in the Indictment.  It is the

25  Government's position that this Defendant does pose a danger

to the community. This case is a unique case in that involves, unfortunately, a former law enforcement officer, and there is a great aspect of public corruption in this particular case as testified to you by the Agent in this case.

Specifically, we know from the testimony, that this Defendant has provided law enforcement-issued radios to drug traffickers. We know that these radios are important because they allow individuals to listen to the communications of law enforcement.

He was paid for his services in exchange for marijuana which he then would sell that marijuana. He has personally acted as a scout for load vehicles, and what that means is that he would go out in his police-issued vehicle and he would make sure that the drug loads would make it so that no other law enforcement official would pull over those vehicles.

But more importantly, and an indication of the danger to the community, he was involved in ripping loads. In other words, he was involved as using his authority as a law enforcement official to pull over vehicles that had narcotics in them and stealing those loads as a very dangerous act, and you have an armed law enforcement individual pulling over drug traffickers and more than likely armed themselves.

1    We also know that we have an individual who
2 falsified a report, Your Honor. That individual was stealing
3 drugs, falsifying reports, violating the public trust and
4 was of great concern to the Government, and you have an
5 individual who had the execution of a search warrant by a
6 joint federal and state law enforcement officials with the
7 HIDTA taskforce. He is actively recording the communications
8 of other law enforcement officials, thereby informing the
9 drug trafficking organization of the identity of these law
10 enforcement officials which is clearly a danger to the law
11 enforcement community.

12    And let us not kid each other, we're dealing with a
13 drug trafficking organization that has ties to the Gulf
14 Cartel.  You don't need an Agent to tell you this, Your
15 Honor.  The Gulf Cartel is an organization that deals in
16 kidnapping, murder, drug trafficking, an incredibly
17 dangerous organization that has unfortunately, as we now
18 know, weaved its way into the American public.

19    But we also have a Defendant who we know is
20 assisting a fugitive of the law, Mr. Ramiro Beltran, Sr.  We
21 know, or have suspicion to believe that Mr. Beltran is in
22 the country of Mexico, and this Defendant is assisting him.

23    And it's important to note that this assisting of
24 this fugitive was as early as April or May of this year.
25 And how do we know that?  Look at the phone tolls.  We know

that whenever Jacqueline Beltran is in Mexico, who is
calling her?  This Defendant.  He's calling her presumably,
as the Agent testified, to be able to communicate with
Mr. Beltran, Sr., and what other information do we have?  We
have the Pacer report.  Sure, these aren't still documents
but they are documents which are dealing with Mr. Beltran,
Sr.'s, case as is ongoing in Federal Court, presumably as
the Agent testified, I think he used a smart phone, which is
prudent to connect the dots that whenever he's calling
Jacqueline, while she's in Mexico, he's clearly providing
information to Mr. Beltran, Sr.

        We also know that this Defendant was involved in
the destruction of evidence.  We have law enforcement
executing a search warrant at a ranch. We did locate the
magazines for the AR-15's and the tactical gear buried in
the bunker, but nonetheless there are weapons used in a
murder that we have co-operators indicating that this
Defendant showed up, took those weapons and presumably
destroyed them, thereby effecting the investigation
involving the kidnapping and murder of that case.

        Your Honor, the Defendant is also a target, as
testified by the Defendant in a cocaine conspiracy as an
ongoing investigation that he is now aware of.  He is now
aware that apart from this drug case, he is being looked at
for a cocaine case. And that leads me into the flight risk

1  area, Your Honor.

2          This is a presumption case. This Defendant is

3  looking at 10 years in federal prison, but the reality is

4  he's looking at a whole lot more because of the 60,000 pound

5  of marijuana that had been attributed to him. He's looking

6  at a lot of enhancements because of the public corruption

7  issues and the abuse of authority that he has exercised in.

8  He now knows that he's looking at a significant amount of

9  time.

10         Your Honor, we also have evidence as to the

11  strength of this case for this Defendant.  We have 13 co-

12  operators, 8 of whom are pointing the finger at this

13  Defendant, saying that he was involved in this organization.

14  We have phone tolls, electronic surveillance.  The

15  conspiracy has spanned several years.

16         We also have evidence, Your Honor, of the

17  Defendant's own drug use as provided by the cooperators

18  involved in this investigation.  We have individuals saying

19  that, not only did he hang out with drug dealers, he is

20  running loads for drug dealers.  He is ripping loads for

21  drug dealers.  He is using narcotics while he is doing this,

22  Your Honor.  And we know his wife has ties to the country of

23  Mexico as testified to you by the Agent in this particular

24  case.

25         So I feel I have to say this, Your Honor, this is a

1  very serious case, and the Defendant is looking at a lot of

2  time.  He is not only a danger to the community as a whole

3  in South Texas, he is a danger to law enforcement community,

4  and I'll remind the Court that the law enforcement official

5  who testified said that Mr. Beltran, Sr., is calling him to

6  threaten him, Your Honor.  Your Honor, he's not only a

7  flight risk, but he's a danger to the community and we're

8  going to ask that he be detained.

9           THE COURT:  Okay.

10          Mr. Guerrero, you may proceed.

11          MR. GUERRERO:  Well, Judge, do I proceed with the

12  remaining witnesses or do I address the Court?

13          THE COURT:  I thought you were done.  I thought you

14  said you said you didn't have anything else.

15          MR. GUERRERO:  Well, that particular witness,

16  actually --

17          THE COURT:  Why don't you proffer what you have

18  left?

19          MR. GUERRERO:  Well, Your Honor, if I'm allowed to

20  bring these witnesses, Rebecca Verdad, Cynthia DeLaCruz and

21  Cynthia Laura DeLaCruz, friend of the family Mrs. Rebecca

22  Vera, Cynthia DeLaCruz, his sister, and Cynthia Laura

23  DeLaCruz, his mom, they would sign off on a co-surety.  Not

24  only would you hear about the co-surety, you would hear and

25  you would get described a young man who's got four different

jobs. You are talking about a young man who worked for the Department, worked as security at What-a-Burger, worked at different jobs just to make sure he was there to support his family. He's got several good reasons to not take flight and those are the three children he takes care of. He's got some really cute little twins and he's got another child I've never had the pleasure of meeting, but I've had the pleasure of meeting the two kids, beautiful children. There's no reason why this man would run. This man will take care and own up to his responsibilities.

I would also proffer to the Court the following. I will proffer, and I've shared the proffer with opposing counsel of the Government today. If the Court would like to examine, there are certificates after certificate just reflecting his diligence as a law enforcement officer. Unfortunately, --

THE COURT: Are you offering these just for my review, or are you offering them as an Exhibit?

MR. GUERRERO: I'm offering them as an Exhibit, Judge.

THE COURT: Okay, so is there any objection to the Defendant's Exhibit Number 1, which is a series of exhibits relating to the Defendant Ramon DeLaCruz, Jr.?

MR. MARTINEZ: No objection, Your Honor.

THE COURT: Okay, Defendant's 1 is admitted.

1        Kendra, do you have a sticker? All right.

2        You may continue, Mr. Guerrero.

3        MR. GUERRERO:  Judge, his combined salaries with

4   his spouse, he has to meet obligations that are pending, his

5   mortgage. He is going to make arrangements to go ahead and

6   get that taken care of.  Judge, he'll have to spend some

7   time in the prison system.  He's got a 16-acre tract and he

8   needs to go out and liquidate so that he can try to go ahead

9   and leave something for his family.  He's got to support his

10  family.  It is all clearly stated in the Pre-trial services

11  report.

12        We well know, and as a practitioner for many years

13  that all of these, even though they are very serious

14  allegations, remain allegations and my client remains

15  innocent.  He's got not the burden of proof but he has the

16  burden at least to show the Court that he's not a risk of

17  flight, which I think really clearly was indicated by the

18  ties to the community, his responsibilities in the

19  community, his record of -- he's got no criminal history.

20  Otherwise, he would never be a peace officer.

21        And also, whether he truly poses a danger to the

22  community, I mean, you are looking at a young man who is

23  going to have a series of safeguards that the Court can

24  fashion to assure that not only is he responsible with a

25  bond, but he also will not have a passport.  He has to

1 surrender all his weapons.  His house is going to be cleared

2 of any weapons.  He is going to be dictated to no drug use.

3 The Court well knows that he will also have a global

4 positioning satellite monitoring device on his ankle to make

5 sure everybody knows where he's at all the time and his

6 restriction is going to be to his house, and as he has

7 always been taking care of his home.

8          Most of the activity alleged by the Government is

9 2010, 2011.  This recent allegation.  This cellular

10 communication with Jacqueline Beltran as of April 1st and

11 2nd, 2016, while Jacqueline was allegedly in Mexico has to

12 do with things that are not even related to this case.  The

13 communication continued in May of 2016 is consistent with

14 two people catching up with whatever things they wanted to

15 catch up about.  Mrs. Beltran, Jacqueline Beltran obviously

16 he knew the Beltran family, got too close to them.  Now,

17 he's got this problem he has to deal with but it's not

18 insurmountable, Judge.

19          The Government knows that cases like this, even

20 though they may be presumption cases can be worked out.

21          So, we're asking the Court to allow him to be on

22 bond with conditions as outlined by the Pretrial Services

23 recommendation, $100,000 bond with a 10 percent deposit and

24 perhaps even add extra co-surety, but we're asking for bond

25 at this time.

1          THE COURT:  Ms. Villarreal?

2          MS. VILLARREAL:  Yes, Judge?

3          THE COURT:  Has the position of United States

4  Probation changed on the bond recommendation?

5          MS. VILLARREAL:  Your Honor, that report was

6  prepared in McAllen.  I did not have the opportunity to

7  interview Mr. DeLaCruz, here, but after hearing this

8  testimony, I would not agree with that bond recommendation.

9          THE COURT:  Okay.  And so, is it Probation's

10  recommendation that I deny bond in Mr. DeLaCruz's case?

11          MS. VILLARREAL:  Yes, Your Honor.

12          THE COURT:  All right, got that on the Record.

13  Thank you.

14          Anything further, Mr. Martinez?

15          MR. MARTINEZ:  Judge, just one more thing.  I would

16  point to Defense Exhibit Number 1 as for danger to the

17  community.  We have an individual that has been trained in

18  the use of force, firearms trained and tactical firearms

19  training.  You have an individual before the Court who knows

20  and has been trained on using firearms and that is something

21  else for the Court's consideration.

22          With that, we would rest, Your Honor.

23          THE COURT:  Okay.

24          Mr. DeLaCruz, if you could please approach the

25  podium?

1    DEFENDANT DE LA CRUZ:  Yes, Your Honor.

2    THE COURT:  First off, I find that the evidence

3 meets the probable cause standard in your case. You've been

4 indicted but also I've considered additional testimony

5 today, and the weight of the evidence is strong, and I'm

6 also in considering the nature and circumstances of the

7 offense, the offenses are serious, not just because they

8 involve drugs, but they also involve what I characterize as

9 crimes of violence, this term that has been used in Court of

10 ripping essentially amounts to robbery, and that's a serious

11 offense, and many times there are, you know, drug

12 trafficking combined with robbery, it places lives in

13 danger, and while not -- I understand so that you understand

14 the Exhibits that your attorney offered on your behalf

15 showed that you have had a significant amount of training.

16    And so, I'm not really trying to use those against

17 you, but the nature of the offense and some of the Exhibits

18 remind me of the seriousness of the offense, such as this

19 "Law Enforcement Code of Ethics," which drives really home

20 the seriousness of the alleged violations along with this

21 weapons training and tactical training and tactical firearms

22 training, really puts an exclamation point behind the

23 seriousness of the offense.

24    The case involves a lengthy conspiracy although

25 much of the criminal activity was maybe not historic but

1   several years ago, but it is relatively recent in the

2   evidence of the communication with the co-conspirator and

3   fugitive, Mr. Beltran, and also, while  you are not alleged

4   to have been directly involved in this alleged murder, there

5   is strong evidence that you were involved in the disposition

6   of the property, and of course the case as I mentioned

7   involves direct allegations of corruption and abuse of

8   position of trust and assisting a fugitive.  Those are all

9   matters that weigh heavily in not setting bond in your case.

10       However, the other things I have to consider are

11   your history and characteristics. You graduated from high

12   school.  You have never been that I can see charged with a

13   criminal offense. You've never been convicted of a criminal

14   offense.  You are a life-long resident of South Texas.  You

15   are married.  You have children.  You have graduated from

16   high school. You have a supportive family who believes that

17   you are not a flight risk.

18       And the issue for me is whether or not conditions

19   can be set which will reasonably assure your appearance at

20   trial and the safety of the community.  Probation initially

21   recommended that I set a bond in your case.  After hearing

22   the evidence, the Probation Department has withdrawn that

23   recommendation.  But in considering the Bail Reform Act and

24   the things that I must, I am going to set bond as originally

25   recommended by the United States Probation Office.

1    I am setting bond, and first off, I should say that

2  this is a high bond.  It's a bond with a lot of conditions

3  and it is done so purposefully because of the concerns that

4  I've just raised and with the concerns that the Government

5  has raised.

6    I am setting a $100,000 bond that is required to

7  have a 10 percent cash deposit.  You are required to have a

8  co-surety or co-sureties who are solvent.  That means that

9  they are on the hook for the full amount of the bond.

10   You have to have a third party custodian. That's

11  someone who is the eyes and the ears of the Court to make

12  sure that you are following the rules of your bond and that

13  third party custodian has to be approved by the United

14  States Probation.

15   You are ordered to submit to supervision by a

16  Federal Probation Officer at the United States courthouse in

17  McAllen, Texas.  A condition of your bond is that you are

18  required to follow all of the instructions that your

19  Probation Officer gives you about your case.

20   Your travel is restricted to the McAllen division

21  of the Southern District of Texas.  There is no travel to

22  Mexico.  Your Probation Officer can give you permission to

23  travel outside of the McAllen division but if he or she

24  says, "No," then your lawyer would have to seek permission

25  of the Court.  You are to maintain employment or be actively

1    looking for a job.  You are not to work in the capacity as a

2    law enforcement officer or for any law enforcement agency,

3    or as a security guard.  You are not to have any employment

4    either directly or indirectly with any law enforcement

5    entity or pseudo law enforcement entity, such as a security

6    guard company.

7              You are not to obtain a passport. Do you have a

8    passport?

9              DEFENDANT DE LA CRUZ:  No, Your Honor.

10             THE COURT:  You are not to have any contact

11   directly or indirectly with any person who might be a

12   witness in the case or a co-Defendant in the case or a

13   potential witness or a potential co-Defendant and that

14   includes, of course, Mr. Beltran, Mr. Beltran, Jr.,

15   Mr. Beltran's daughter or anyone else who might have

16   anything to do at all with this case.  And that is either

17   directly or indirectly.  That means no contact yourself,

18   through third parties or through social media or other

19   means.

20             You are not to possess any weapons.  Do you have

21   any firearms in the house?

22             DEFENDANT DE LA CRUZ:  Your Honor, I've been a law

23   enforcement officer for the past 14 years --

24             THE COURT:  Okay, before you are released, those

25   firearms are to be removed from the house to the

1   satisfaction of the United States Probation Office.

2          I'm ordering that you not use alcohol while on bond

3   and I'm also ordering that you not use or possess any

4   illegal drugs or narcotic drugs and that you are ordered to

5   submit to periodic drug testing.

6          Based on the information that's provided at Court,

7   in Court today, I'm also ordering that you participate in

8   substance abuse counseling and treatment as directed by your

9   Probation Officer.  I'm also requiring that you submit to

10  home detention, which means that you are restricted to your

11  residence at all times except for employment, education,

12  religious services, medical appointments, substance abuse,

13  and mental health counseling, attorney visits, Court

14  appearances, Court-ordered obligations, and other activities

15  approved by your Probation Office.  And this includes active

16  GPS monitoring.

17         With regard to your travel, Mr. Guerrero and

18  Mr. Ramirez, are you-all in McAllen?

19         MR. RAMIREZ:  Rio Grande City.

20         THE COURT:  Rio Grande City.  Okay, so that would

21  not present a problem, but Mr. DeLaCruz you, of course, may

22  come to Victoria for your Court appearances or Corpus

23  Christi if you have any Court appearances here.  But you

24  need to tell your Probation Officer when you are traveling

25  for your Court appearances.

1        Also, if you have any contact with law enforcement

2  officers, such as if you are arrested or questioned, or

3  searched you are to report that contact to your probation

4  officer as soon as possible.

5        Any further requests from Probation -- I'm sorry,

6  from Pretrial?

7        MS. VILLARREAL:  No, Your Honor.

8        THE COURT:  And without waiving your objection to

9  my setting bond, Mr. Martinez do you have any further

10  requests?

11        MR. MARTINEZ:  No further requests in reference to

12  the bond.  However, the United States would move to file

13  this Motion of Stay with the Court.

14        THE COURT:  Okay.

15        MR. MARTINEZ:  I've provided copies to Defense

16  Counsel.

17        THE COURT:  Okay, that's fine.  I'll get to that in

18  a moment.

19        Now, Mr. DeLaCruz, do you understand the conditions

20  of the bond that I set in your case?

21        DEFENDANT DE LA CRUZ:  Yes, Your Honor.

22        THE COURT:  All right, I need to advise you that if

23  you violate any of the conditions of the bond that I set,

24  your bond can be revoked and you can be ordered back into

25  custody.

1    Do you understand that?

2    DEFENDANT DE LA CRUZ:  Yes, Your Honor.

3    THE COURT:  Also, when you are released, if you

4  don't show up to Court, there are a number of things that

5  very likely will happen.  One is that you could be, if you

6  willfully failed to appear for any Court setting, you could

7  be charged with another federal crime called "Failure to

8  Appear."

9    Do you understand?

10    DEFENDANT DE LA CRUZ:  Yes, Your Honor.

11    THE COURT:  And also for those persons who sign

12  your bond on your behalf, if you fail to show up to Court,

13  you could lose the -- or your family could lose the $10,000

14  and along with the $100,000 bond. That means that the

15  Government could seek a judgment against your co-signers for

16  $100,000.

17    Do you understand that?

18    DEFENDANT DE LA CRUZ:  Yes, Your Honor.

19    THE COURT:  And whatever your situation is today,

20  as you stand before me today, if you do not show up to

21  Court, your situation will be significantly worse.

22    Do you understand that?

23    DEFENDANT DE LA CRUZ:  Yes, Your Honor.

24    THE COURT:  Now, a couple of things.  First, the

25  Government has submitted this Motion to Stay the Release of

Mr. DeLaCruz, which means Mr. DeLaCruz, the Government, as
is their right, they are appealing my setting bond in your
case, to Judge Rainey, and they are seeking that your
release from custody be stayed until Judge Rainey has an
opportunity to review this decision, and it's only
appropriate that I grant that Motion, and give the parties
an opportunity to present this matter to Judge Rainey.

So, I am granting the Government's Motion to Stay
and Order that you not be released until Judge Rainey has
had an opportunity to review my decision, and after that
decision is made your attorneys will notify you of the
outcome of that appeal.

And let me see, there's a couple of other things.
One, with regard to this potential conflict of interest, I
believe and am satisfied that having the Hearing today was
the right thing to do for purposes of keeping this case on
track and moving forward, but I also believe that this is
the type of thing that should be resolved sooner than later.
So I am directing the Government to file its motion, if any,
to disqualify or at least however the Government wants to
phrase the potential conflict of interest.

Do you think a week would be a long enough time for
the Government to file that motion, and you may confer with
Ms. Booth who has made an appearance?

MR. MARTINEZ: Yes, Your Honor, we believe a week

1   is sufficient.

2          THE COURT:  Okay, so file that motion within a week

3   just so that Judge Rainey can have it considered before, you

4   know, in a timely fashion and so that the Defendants can

5   obviously file their response to the motion.

6          So, we've taken care of the Arraignment.  We've

7   taken care of the Detention Hearing. It's stayed.

8          Mr. Guerrero, do you have anything further for

9   today's purposes?

10         MR. GUERRERO:  Nothing further, Your Honor.

11         THE COURT:  Okay.  Anything further from the

12  Government, Mr. Martinez?

13         MR. MARTINEZ:  No, Your Honor. The Motion to Stay,

14  the response that the Government is going to file.  Can we

15  file it in a week, and the reason I ask for a week is I know

16  it is Judge Rainey's procedure to request the transcript

17  from this Hearing.

18         THE COURT:  I'm aware of that, too.  It's going to

19  take a while, so you are going to probably order the

20  transcript today and get it, get the Court Reporter typing

21  on it.

22         MR. MARTINEZ:  Yes, Your Honor.

23         THE COURT:  Okay, all right.  Understood.  I think

24  that's sufficient time.

25         All right, well thank you-all for your appearances.

1    Mr. DeLaCruz may be remanded.

2    DEFENDANT DE LA CRUZ:  Thank you, Your Honor.

3    THE COURT:  You're welcome.

4    (Proceedings adjourned at 3:40 p.m.)

5    *  *  *  *  *

6    *I certify that the foregoing is a correct*

7    *transcript to the best of my ability produced from the*

8    *electronic sound recording of the proceedings in the above-*

9    *entitled matter.*

10   */S/ MARY D. HENRY*

11   *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

12   *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET\*\*D-337*

13   *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

14   *JTT TRANSCRIPT #55851*

15   *DATE:  OCTOBER 17, 2016*

16

17

18

19

20

21

22

23

24

25